**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD. ET AL. and the OFFICIAL STANFORD INVESTORS COMMITTEE,** | ) ) ) ) ) ) |
| *Plaintiffs*, | ) **Case No. 3:11-CV-00297** ) **JURY DEMANDED** |
| v. | ) ) |
| **PETER ROMERO,** | ) ) |
| *Defendant*, | ) ) ) |

**DEFENDANT PETER ROMERO'S BRIEF IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| **RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD. ET AL. and the OFFICIAL STANFORD INVESTORS COMMITTEE,** | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:11-CV-00297** |
| **v.** | ) ) ) | **JURY DEMANDED** |
| **PETER ROMERO,** | ) ) | |
| **Defendant,** | ) ) ) | |

## TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................................ 1

II.      SUMMARY JUDGMENT EVIDENCE ............................................................ 3

III.     FACTUAL BACKGROUND .............................................................................. 4

IV.      PLAINTIFFS' ALLEGATIONS ...................................................................... 13

V.       ARGUMENTS AND AUTHORITIES............................................................... 13

        A.     FRCP Rule 56 Summary Judgment Standard....................................................... 13
        B.     Romero Is Entitled to Summary Judgment on Plaintiffs' Fraudulent Transfer
               Claim Because He Received The Disputed Payments in Good Faith and for
               Reasonably Equivalent Value. ............................................................................... 14
        C.     Romero Is Entitled to Summary Judgment that Plaintiffs Cannot Recover His
               Principal Investment in an SIB CD........................................................................ 24
        D.     Romero is Entitled to Summary Judgment on Plaintiffs' Unjust Enrichment Claim.
               ................................................................................................................................ 25

## **TABLE OF AUTHORITIES**

**Cases**

*Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771, 772 (6th Cir.1995) ............ 18, 19

*Anderson v. Liberty Lobby,* 477 U.S. 242, 254 (1986) ................................................. 14

*Baton Rouge Oil & Chem. Workers Un. v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002) ...................................................................................................................... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. at 2552 (1986) ................................. 13, 14

*Connect Insured Telephone, Inc. v. Qwest Long Distance, Inc.*, 2012 WL 2995063, *9 (N.D. Tex. 2012) ........................................................................................................... 25

*Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005, pet. denied) .................................................................................................... 14

*Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) ................................. 25

*Heldenfels Bros, Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) ........................ 25

*In Re IFS Fin. Corp.*, 417 B.R. 419, 442 (S.D. Bankr. Tex. 2009) .......................................... 15

*In re WCC Holding Corp.*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) .................................... 21

*Janvey et al. v. TGC, LLC*, Civil Action No. 3:11-CV-0294-N ("TGC Order") .. 17, 18, 19, 20, 23

*Janvey v. Alguire*, Case 3:09-cv-00724-N-BL (the "Net Winners Order") ..................... 22, 24, 25

*Janvey v. Democratic Senatorial Campaign Cmte.*, 793 F. Supp. 2d 825, 834-35 (N.D. Tex. 2011). .................................................................................................................. 15

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996) .................................................................................. 19

*Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. struck) ............ 25

*Ramirez Rodriguez v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) ................................................................................................................. 22, 23

*Randy v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995) ...................................................................................................................... 22, 23

*Richardson Hospital Authority v. Duru*, 2012 WL 5506984, *3 (Tex. App.—Dallas 2012) ....... 25

*Samson v. U.S. West Commc'ns, Inc. (In re Grigonis)*, 208 B.R. 950, 956 (Bankr. D. Mont. 1997) ...................................................................................................................... 19, 20

*Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (N.D. Tex. 1992) ........ 21

*Waind v. Waxenberg*, 611 F.Supp.2d 1299, 1320 (M.D. Fla. 2009) .......................................... 15

*Warfield v. Byron*, 436 F.3d 551, 555, 560 (5th Cir. 2006) .................................................... 22, 23

**Other Authorities**

Tex. Bus. & Com. Code § 24.004(d) ........................................................................... 21

TUFTA § 24.004(a) ..................................................................................... 18, 19

**Rules**

Fed. R. Civ. P. 56 (a) ........................................................................... 13, 14

Fed. R. Civ. P. 56(c) ........................................................................... 14

FRCP Rule 56 ..................................................................................... 13

**DEFENDANT PETER ROMERO'S BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

Defendant Peter Romero ("Romero") files his Brief in Support of Motion for Summary Judgment and in support respectfully shows as follows:

## I.    INTRODUCTION

For more than 24 years, Peter Romero served his country as a member of the diplomatic corps.  Romero held several positions in the State Department, primarily in Latin America, including U.S. Ambassador to Ecuador. Eventually Romero rose through the ranks to become Assistant Secretary of State in charge of the Bureau of Western Hemisphere Affairs.  During his distinguished public career, Romero obtained unparalleled knowledge of political issues and general economic trends in Latin America. He also gained a thorough understanding of the role of the United States and its businesses in the geopolitical landscape.

After Romero retired from public service, a number of companies sought his advice as an outside consultant for their activities in Latin America.  One of these companies was Stanford Financial Group ("SFG").[1]  As a contract consultant to SFG between 2001 and 2008, Romero, among other services, attended and sometimes arranged meetings with foreign business and political leaders, made speeches on political and economic issues within his expertise, prepared policy analyses, opened doors for SFG to participate in investment opportunities, analyzed geo-political issues and economic trends in Latin American countries in which SFG was operating or wished to operate, advised SFG based on the knowledge he had acquired during his tenure with the State Department, and handled other tasks within his expertise.  During this time, Romero made over thirty trips to Latin American and/or the Caribbean at the request of SFG, and handled several matters within the United States.

---

[1] The term "SFG" shall refer to Stanford Financial Group and all of its affiliated entities unless stated otherwise herein.

In exchange for these services, SFG paid Romero $100,000 per year in quarterly installments and reimbursed him for travel and related expenses. This compensation was in line with (if not less than) compensation paid to Romero by other companies for similar services. The services Romero provided SFG—services very few people would have the experience and expertise to provide—constituted reasonably equivalent value for the compensation paid to him.

Romero acted at all times in good faith. At no time was he aware of information that should have aroused suspicion regarding SFG's activities. As an outside consultant, Romero was not involved in the daily operations of SFG. Importantly, Romero had no involvement in the marketing or selling of the now infamous Stanford certificates of deposit ("CDs") or the investment or allocation of proceeds from the CDs. Indeed, Romero himself owned a Stanford CD, which he divested after a short period of time as part of an overall restructuring of his investment portfolio. That Romero acted in good faith in dealing with SFG is further illustrated by the fact that he helped secure a job at SFG for his son, Alex, who had recently graduated from college. No father would throw his child into the fray of a company he knows or even suspects to be rife with fraud. Like all but the very top executives within SFG, Romero had no idea Allen Stanford was running a fraudulent scheme.

At the time he associated with SFG, Romero had an impeccable track record as a highly-decorated and well-respected Foreign Service Officer. Upon retiring from the public sphere, he looked forward to a prosperous future as a consultant with numerous opportunities to leverage his background and experience for the benefit of his clientele. The notion that Romero would jeopardize his future and good name by knowingly associating with a company he even suspected might be running a Ponzi scheme is illogical. That he would then secure a job for his only child at a company he believed to be a fraud is simply ludicrous.

The truth is Romero entered into an arms' length, market-rate contractual agreement to

serve as an outside consultant for a company that, from all appearances, was a respected and highly successful company.  He provided the commercially valuable services expected of him in exchange for a fixed yearly fee that was commensurate with compensation paid to him for similar consulting engagements.  In short, Romero did nothing wrong and earned his money. Because he acted in good faith and provided reasonably equivalent value, Romero is entitled as a matter of law to keep his consulting compensation and the related expense reimbursements.

## II.       SUMMARY JUDGMENT EVIDENCE

Romero relies upon and fully incorporates by reference the following which are attached to the Appendix in Support of Defendant Peter Romero's Motion for Summary Judgment and Brief in Support filed concurrently herewith:

a.       Declaration of Peter Romero ("Romero Decl.") (APP 001-012);

b.       July 2, 2001 Engagement Letter (APP 013);

c.       Romero Chronology (APP 014-017);

d.       April 24, 2007 Romero Email – Subject: "Romero-Notes on SFG Ecuador" (APP 018);

e.       Examples of Romero's Speech Topics (APP 019-036);

f.       Romero Letter of Recommendation for Stanford Purchase of Venezuelan Bank (APP 037);

g.       Examples of Romero's Efforts in Connection With Venezuelan Fraud Case (APP 038-047);

h.       Documents Relating to SFG's Successful Investment Through ACON (APP 048-056);

i.       $230,000 Stanford Certificate of Deposit Purchased by Peter Romero and Ruth F. Espey Romero on August 18, 2003 (APP 057);

j.       Payment Schedule Attached as Exhibit KVT-12 to April 18, 2014 Declaration of Karyl Van Tassel (APP 058-059);

k.       February 15, 2009 Email from Lula Rodriguez to IAB Members, Etc. (APP 060-066);

l.      February 18, 2009 Resignation Letter From Romero (APP 067);

m.      Romero's Passport (APP 068-095);

n.      Examples of Invoices and Reimbursement Documentation Submitted by Romero (APP 096-107);

o.      Excerpts of Deposition of Yolanda Suarez ("Suarez Depo") (APP 108-172);

p.      Excerpts of Deposition of Juan Rodriguez-Tolentino ("Rodriguez-Tolentino Depo") (APP 173-185);

q.      Excerpts of Deposition of Maria "Lula" Rodriguez ("Rodriguez Depo") (APP 186-214); and

r.      Plaintiffs' Joint Objections, Answers, and Responses to Defendant's First Set of Discovery ("Plaintiffs' Discovery Responses") (APP 215-243).

## III.   FACTUAL BACKGROUND

### Romero's Background and Service in Department of State

Romero received Bachelor of Science and Master of Arts Degrees in International Relations from Florida State University in 1971 and 1972, respectively.  Romero Decl. ¶ 2.  He then worked as a teacher and teacher-trainer for five years.  *Id.*  After serving as a consultant to the Department of Labor on Job Corps programs, he joined the State Department.  *Id.*

Romero spent approximately twenty-five years serving his country as a U.S. Foreign Service Officer both in Washington, D.C., and abroad.  Romero Decl. ¶ 3.  Romero served in various high-ranking positions, including as U.S. Ambassador to Ecuador and Chief of Mission of the U.S. Embassy in San Salvador.  *Id.*  Romero was selected as the Principal Deputy Assistant Secretary of State for Western Hemisphere Affairs in 1996 and, under both President Clinton and President George W. Bush, served as the Assistant Secretary of State for Western Hemisphere Affairs, a position which required confirmation by the United States Senate.  *Id.*  In that position, Romero was the senior State Department official on all matters in the Western Hemisphere and reported directly to the Secretary of State.  *Id.*

Romero shares the honor of having been the highest-ranking career Hispanic officer in the history of the State Department. Romero Decl. ¶ 4.  Romero's awards include: the Distinguished Honor Award – the State Department's highest award (2001), the Equal Employment Opportunity Award (1998), the Baker-Wilkins Award for leadership of an overseas mission (1993), and the Walter J. Stoessel Award in recognition of his distinguished career.  He has also received several Superior Honor Awards.  Romero is fluent in Italian and Spanish.  *Id.*

### Romero Enters the Private Sector

Upon retiring from public service in 2001, Romero began work as a consultant, offering his years of knowledge and expertise in international relations to various companies.  Romero Decl. ¶ 5.  Romero did not need to formally advertise his services; instead he could rely on "word of mouth" promotion.  *Id.*  Given his unique background and experience, companies lined up to gain access to his advice and compensated him accordingly.  The following are examples of some of the services he provided and the compensation he received between 2001 and 2008:

- Newmont Mining, Denver, Colorado – Romero received $12,000 per month for 30 months to provide community-centric solutions to prevent disruptions to mining operations and to act as a government liaison in Peru;
- American Airport Management, Buenos Aires, Argentina – Romero received $15,000 per month for four years for identifying airport construction and management opportunities for the firm in the Americas and United States;
- Grupo Bueno, Guatemala – Romero received $8,000 per month for two years for working through discriminatory regulatory issues on the sale of US poultry in Central America;
- Mars Corporation, McLean, VA – Romero received $10,000 per month for 10 months to lobby the Government of Ecuador to rescind laws that negatively impacted the sale of Mars products in Ecuador and the purchase of Ecuadorean-grown cocoa;
- Xela Enteprises, Toronto, Canada – Romero received $10,000 per month for 18 months to provide political and market expertise on Central America and South America related to poultry, fresh fruit and vegetable exports to Canada; and
- Seregua, Guatemala – Romero received $15,000 per month for 6 months to assist in attempts to reach a settlement in a case before the Guatemalan courts involving the sale of several hundred of busses by Daimler Benz, Brazil to the Guatemalan government, which denied distributor rights and compensation to Seregua. Romero Decl. ¶ 5.

Romero was introduced to Allen Stanford on January 20, 2001 at one of several parties in Washington celebrating George W. Bush's inauguration as the 43rd President. Romero Decl. ¶ 6. Later that year when it became public Romero was retiring from the Foreign Service, SFG's Chief of Staff, Yolanda Suarez, called Romero to set up an appointment in his office with Mr. Stanford. *Id.* In or around May 2001, Romero met with Mr. Stanford at Romero's office in the State Department and Mr. Stanford asked if Romero would be interested in being a member of the Stanford International Advisory Board ("IAB") after his retirement. *Id.*

As Mr. Stanford described it in that meeting, the IAB was an entity distinct from the Stanford Board of Directors and was limited to providing SFG with advice on foreign political events, foreign governmental activities, government regulations and analysis of current affairs and government activities in foreign markets of interest to SFG. Romero Decl. ¶ 7; *see* Suarez Depo 27:17-28:2 (APP 120-121). Mr. Stanford explained that he wanted Romero to serve on the board because of his 24 years of experience as a career foreign service officer and his considerable knowledge of political affairs and command of foreign language, particularly in the regions of Latin America and the Caribbean. Romero Decl. ¶ 7.

Moreover, Ms. Suarez, who served as general counsel and later chief of staff at SFG— and believes she may have proposed the idea of the IAB (Suarez Depo 27:25-28:2 (APP 120-121))—worked to convince Romero to join the IAB because "his expertise and his experience in the region [of Latin America] … would be an invaluable resource." Suarez Depo 44:20-45:20 (APP 129-130). Ms. Suarez "thought at the time that certainly given his position, if [Romero] accepted [SFG's] offer … to become an advisory board member it really would be a singular honor for the organization." Suarez Depo 46:2-6 (APP 131). Ms. Suarez believed that Romero knew the interrelations between Latin America and the United States better than anyone. *See* Suarez Depo 52:1-25 (APP 133).

At the time, Romero knew little about SFG other than what he had read or heard in media reports.  Romero Decl. ¶ 8.  SFG appeared to him to be a successful, well-regarded company but he wanted to determine whether there was any available information about which he should be aware before associating himself with the company.  *Id.*  Romero contacted his friend, Randall Beers, at that time the Assistant Secretary of State for Narcotics and Law Enforcement Affairs, in order to obtain information regarding Mr. Stanford and SFG.  In particular, because SFG was a financial institution, Romero wanted to know whether SFG was in compliance with U.S. law and international standards required to guard against money laundering.  *Id.*  Two weeks later, Mr. Beers reported that he did not find any information that should dissuade Romero from accepting SFG's offer.  *Id.*

After his retirement from public service, and based on his due diligence as described above, Romero accepted SFG's offer to serve as a member of the IAB.  Romero Decl. ¶ 9.  The terms of his engagement were broadly described in a letter from Allen Stanford dated July 2, 2001, in which Mr. Stanford noted that "given our operations and interests in Latin America and the Caribbean your expertise and counsel will be invaluable to us."  (APP 013).  The letter also described Romero's compensation: "$100,000 per year, payable quarterly, along with reimbursement for travel and related expenses."  *Id.*   According to Ms. Suarez, IAB compensation was based on what SFG personnel believed was reasonable for the individual.  *See* Suarez Depo 48:13-20 (APP 132).

Such compensation is also in line with compensation paid to Romero for other consulting engagements as described above, including several engagements on which he spent far less time than he did on SFG projects.  In particular, Romero spent far more time on Stanford projects on an average monthly basis than he did on projects for Newmont Mining, American Airport Management, Mars Corporation or Seregua.  Romero Decl. ¶ 10.

*Romero Provides Consulting Services to Stanford*

From the summer of 2001 until February 2009, Romero served as an outside consultant to SFG as a member of the IAB.  As set forth below, Romero spent a considerable amount of time working on SFG's behalf.

The name "International Advisory Board" is a misnomer. The IAB was not the sort of "board" one thinks of in a corporate setting.  It did not meet to discuss topics on which members would make collective decisions to advise SFG. Rather, the IAB was a roster of outside consultants retained based on their individual backgrounds and expertise in geographical areas in which SFG had expanded or hoped to expand its legitimate businesses.[2]  Romero Decl. ¶ 12; Suarez Depo 26:22-27:7  (APP 119-120),  28:16-29:3  (APP 121-122),  137:18-23  (APP 147); Rodriguez-Tentino Depo 22:7-10 (APP 177), 29:12-18 (APP 178).

The members operated independently of one another, rarely met together and never took any sort of collective action.  *See* Suarez Depo 128:23-129:2 (APP 146-147).  They had no decision making power, no oversight responsibilities, and no involvement in the daily operations of SFG.  Romero Decl. ¶ 13; Suarez Depo at 138:3-19 (APP 148).  Similarly, they were not involved in marketing or selling the infamous Stanford CDs, nor were they involved in the allocation of funds paid by investors for their purchase of the CDs. Romero Decl. ¶ 13; Suarez Depo at 138:20-139:3 (APP 148-149).  Instead, the board members were available to provide their expertise and connections on an as-needed basis.  Romero Decl. ¶ 13.

While the bulk of his outside advisory to SFG consisted of traveling to countries in Latin America (Romero made at least 31 trips to Latin America at Stanford's request as well as an additional trip to Switzerland), Romero was regularly asked for assistance related to domestic

---

[2] For example, one member was the former President of Switzerland, who lent experience with European markets at a time when SFG was opening an office there.  Also, an ex-Foreign Secretary of Mexico was added to the IAB when SFG had plans to expand Mexican banking operations.  *Romero* Decl. ¶ 12.  As described above, Romero was invited to join the IAB for his political expertise and contacts throughout Latin America.

matters, such as advice regarding U.S. government policies and plans, introductions to State Department policy makers for the Western Hemisphere area and non-banking issues related to visas, residency permits, permitting for charitable contributions to youth athletics in Cuba, and so on.  Romero Decl. ¶¶ 14-15.[3]

After SFG acquired the Washington Financial Group, a risk assessment firm, Romero worked closely with that group, making presentations to clients (mostly investment fund managers) during annual meetings and teleconferences three to four times a year, providing them with analyses on investment climates in Latin America, opportunities related to the just-ratified Central American Free Trade Agreement, and other foreign policy and security-related issues impacting on client investment.  Romero Decl. ¶ 16.

In addition to specific country regulatory or governmental issues on which he was asked to advise (four or five times a year), about two to three times per year Romero was asked to speak at events for SFG in various Latin American countries. Drawing from Romero's 25 years of experience with Washington and Latin American governments and politics, these working breakfasts, luncheons and dinners were organized around themes of general interest to attendees. Over the years, Romero's speech topics included presentations on, for example: (1) "U.S. policy towards Latin America," (2) "What the Central America/U.S. Free Trade agreement will mean for Central America and Panama," (3) "The Emerging lineup of key officials for the second Bush Administration," and (4) "Prospects for Immigration Reform in the U.S." Romero would typically speak for about 30 minutes followed by a short Q&A session.  Romero never discussed SFG business during these presentations.  Romero Decl. ¶ 17; Suarez Depo 40:10-41:2 (APP

---

[3] *See also* Romero Chronology (APP 014-017); Suarez Depo 146:22-147:1 (APP 153-154) (Romero made a number of trips to Latin American and Caribbean on behalf of SFG), 123:24-125:16 (APP 142-144) (Romero provided services to SFG as well as executives of its Latin American affiliates), 161:18-163:3 (APP 164-166) (Romero gave general advice, not specific growth strategies); April 24, 2007 Email regarding Romero's work in Ecuador (APP 018).

127-128).[4]  Romero also wrote newsletter articles on current events.  Romero Decl. ¶ 17.

In 2004, SFG was interested in acquiring a commercial bank in Venezuela and asked Romero to sign a letter of recommendation on behalf of Allen Stanford and SFG.  While Romero advised against the purchase of the bank given the volatile political climate under the Hugo Chavez regime and the possibility of government nationalization of private business in Venezuela, he agreed to sign the letter of recommendation.  *See* Letter (APP 037); Romero Decl. ¶ 18.  At the time, Romero believed Mr. Stanford to be a highly respected and successful businessman and had no qualms with signing a letter recommending the approval of the purchase of the bank.  Romero Decl. ¶ 18.  SFG ultimately purchased the bank which did not market or sell Stanford CDs.  Instead, it was a local commercial institution for Venezuelans.  *See* Rodriguez-Tolentino Depo 32:8-17; 33:8-11 (APP 179); Suarez Depo 96:4-97:9 (APP 137-138).  And when the Receiver took over SFG, the bank was sold with no harm to any depositors.  Romero Decl. ¶ 18.

In 2006, it was discovered that the head of SFG's Caracas, Venezuela office embezzled approximately $20 million from SFG.  Romero Decl. ¶ 19.  SFG asked Romero to guide the new head of the Caracas office as to what could be done to bring the fraud to the attention of U.S. government officials to help recover the funds.  *Id.*  Among other tasks, Romero briefed U.S. Embassy and State Department officials on the embezzlement, arranged meetings with officials at the U.S. Embassy in Caracas, investigated and followed up with U.S. officials on their questions regarding the embezzler.  *Id.*; Suarez Depo 147:6-148:2 (APP 154-155); 149:24-150:4

---

[4] Other examples of Romero speech topics at SFG events include:  "The Future of the Americas" (APP 019), election outlook in key Latin American countries, etc. (APP 023, 025), "Latin American Landscape" (APP 027), "lively discussion of pending trade issues" with a focus on "trade agreements with Peru, Columbia and other key countries" (APP 029), "Latam, a view from the US.  Possible impacts of the elections in the US Policy for Latam" (APP 033), and "The First 100 Days of Obama" (APP 036).

(APP 156-157).[5]

Romero was also instrumental in securing investment opportunities for SFG through a relationship with ACON Investments, Inc. ("ACON").  *See* Suarez Depo 143:16-145:10 (APP 150-152).  ACON is an international private equity firm based in Washington, DC that focuses primarily on investment opportunities in Latin America.  The principal of ACON is Bernard Aronson, a former State Department official under whom Romero worked for several years.  Romero Decl. ¶ 23.  Recognizing Romero's expertise, ACON initially approached Romero as part of their vetting process of the family in Ecuador that owned and operated the Fybeca chain, which was a family-owned pharmacy chain similar to a CVS or a Walgreen's.  *Id*.  ACON later approached Romero for assistance in locating investors for a deal involving Fybeca.[6]  Romero Decl. ¶ 24.  After pursuing possibilities without success, Romero approached SFG about its interest in investing.  SFG ultimately invested $4 million in a limited partnership that obtained an interest in Fybeca, which was also known as Amepharm.  When the investment wound up a few years later, SFG had earned more than $4 million in profit on its $4 million investment.  *Id.*; *see also* Documents Relating to SFG's Successful Investment Through ACON (APP 048-056).  SFG's profit on this single investment was more than five and a half times the total amount it paid to Romero for consulting services during his entire seven year engagement.  (APP 056)[7]

***Other Facts Relevant to Romero's Dealings with Stanford***

On August 18, 2003, Romero and his wife purchased a Stanford CD for $230,000.  *See*

---

[5] APP 038-047 contains several emails regarding Romero's work on the Venezuelan fraud matter.

[6] Suarez testified that there would have been nothing wrong with Romero having a financial relationship with ACON at this time.  *See* Suarez Depo 164:21-165:2 (APP 167-168).

[7] Romero also engaged in other tasks that are further detailed in his declaration, including (1) working to secure permission from the Department of the Treasury for Mr. Stanford to contribute to "Youth Cricket" in Cuba, (2) working to secure permission from the United States Government for a Cuban cricket team to participate in a large, international tournament put together by SFG for which Stanford hoped to eventually sell what he anticipated would be extremely valuable television rights (Suarez Depo 165:8-166:2 (APP 168-169); 167:3-15 (APP 170)), and (3) working to identify an experienced airport operator in connection with Stanford's plan to bid on a project to construct a new airport in St. Johns. Romero Decl. ¶¶ 20-22.

CD (APP 057).   On February 18, 2004, the Romeros sold the CD and received a total of $234,862.15.   *See* Payment Schedule Attached as Exhibit KVT-12 to April 18, 2014 Declaration of Karyl Van Tassel (APP 058-059); Romero Decl. ¶ 25.   The couple had been working with an investment advisor on a more diversified investment strategy and the advisor's proposed allocation did not involve a Stanford CD.   Romero Decl. ¶ 25.   The sale of the CD was not based on any inside knowledge regarding SFG's activities, because Romero had no such knowledge. *Romero* Decl. ¶ 25; Suarez Depo 150:24-151:11 (APP 157-158).

In fact, Romero never developed any concerns about Stanford's operations while he served as an outside consultant.   Romero and his wife were actually in discussions with an SFG investment advisor in late-2008 and early-2009 (just before SFG's fraud was exposed) regarding the possibility of her handling their entire portfolio.   Romero Decl. ¶ 26.   Moreover, in 2007, Romero helped to secure a job at SFG for his son, Alex, who had recently graduated from college.   Romero's son ultimately obtained a position working in the communications department.   Romero Decl. ¶ 27.

On February 15, 2009, only two days before the SFG news broke, Romero and the other IAB members received an email from Lula Rodriguez, SFG's Director of Global Communications and Corporate Affairs, refuting negative reports that surfaced regarding SFG and circulating bullet pointed arguments in response thereto.   *See* APP 060-066; Rodriguez Depo 27:20-24 (APP 190); 72:17-77:17 (APP 192-197).   Rodriguez testified in her deposition that she would not have sent the email if she had known its contents were untrue and that she was ultimately "shocked" to learn otherwise.   *See* Rodriguez Depo 71:14-25 (APP 191); 77:18-22 (APP 177).   Romero also assumed and believed the bullet pointed arguments were accurate when he received them.   Romero Decl. ¶ 28.

Romero did not believe SFG had engaged in any wrongdoing until his son called to inform him that the office where he worked had been taken over by federal agents and that he was forced to immediately leave the building.  Romero Decl. ¶ 29.  Upon learning of the SEC's allegations against SFG, Romero immediately resigned from the IAB and terminated his association with SFG.  *See* APP 067.

## IV.   PLAINTIFFS' ALLEGATIONS

On April 21, 2011, Plaintiffs filed their First Amended Complaint [Dkt. #10] ("Complaint") against Romero, asserting claims of fraudulent transfer and unjust enrichment. The factual allegations by the Receiver and the Committee are: (1) SFG was running a Ponzi scheme by selling fraudulent CDs, and (2) SFG made payments to Romero from the proceeds of the sale of the CDs.  Other than a baseless, conclusory allegation that Romero was an "insider" of SFG, Plaintiffs assert no facts to suggest Romero knew or should have known of the alleged Ponzi scheme as an insider of SFG.   Indeed, Plaintiffs' Complaint contains no specific allegations of any kind regarding the services actually provided by Romero.

Instead, Plaintiffs base their case on the argument that, as a matter of law, "providing services in furtherance of a Ponzi scheme does not confer reasonably equivalent value." Complaint at ¶ 41.  Yet the Complaint never explains how the services provided by Romero furthered the Stanford Ponzi scheme.   And when Romero sought clarification of Plaintiffs' position through written discovery, Plaintiffs' responses were equally vague.  *See* Plaintiffs' Discovery Responses (APP 222).

## V.   ARGUMENTS AND AUTHORITIES

### A.   FRCP Rule 56 Summary Judgment Standard

Summary judgment is proper if the movant shows that there are no genuine disputes of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56

(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In evaluating the evidence presented, the Court must view that evidence through a "prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby,* 477 U.S. 242, 254 (1986). The trial judge must determine whether a reasonable jury could return a verdict for the non-moving party. *Id.* at 252.

Romero is entitled to summary judgment because (a) the credible summary judgment evidence proves as a matter of law that Romero received all payments from SFG in good faith and in exchange for reasonably equivalent value; (b) the credible summary judgment evidence conclusively negates one or more essential elements of Plaintiffs' alleged cause of action for unjust enrichment; and (c) Plaintiffs cannot, by pleadings, answers to interrogatories, admissions on file, or other admissible evidence, demonstrate there is any evidence to support their alleged cause of action for unjust enrichment against Romero. Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Baton Rouge Oil & Chem. Workers Un. v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

**B.     Romero Is Entitled to Summary Judgment on Plaintiffs' Fraudulent Transfer Claim Because He Received The Disputed Payments in Good Faith and for Reasonably Equivalent Value.**

In the context of a TUFTA claim, a defendant who invokes the "good faith" affirmative defense "carries the burden of establishing good faith and the reasonable equivalence of the consideration obtained." *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005, pet. denied).

**1.        The evidence conclusively demonstrates Romero acted in good faith.**

A transferee who takes property without knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of a transfer takes the property in good faith and is a bona fide purchaser. *Flores*, 161 S.W.3d at 756.

The relevant question is "whether the transferee had actual knowledge of the debtor's fraudulent purpose or had knowledge of such facts or circumstances as would have induced an ordinarily prudent person to make inquiry, and such inquiry, if made with reasonable diligence, would have led to the discovery of the transferor's fraudulent purpose." *Waind v. Waxenberg*, 611 F.Supp.2d 1299, 1320 (M.D. Fla. 2009) (discussing how good faith is determined under the Florida UFTA which is virtually identical to TUFTA). The evidence shows that Romero did not have, nor should he have had, knowledge of the Stanford Ponzi scheme or any "fraudulent purpose." Romero acted in good faith.

In fact, there is no reasonable dispute that Romero acted in good faith. In determining good faith under TUFTA, courts apply an objective test and consider whether the transferee "knew or should have known" of the fraud. *World Vision*, 275 B.R. at 659 (citations omitted); *In Re IFS Fin. Corp.*, 417 B.R. 419, 442 (S.D. Bankr. Tex. 2009).

The Court has previously held as a matter of law that the "facts underlying the Receiver's claims were inherently undiscoverable to the Stanford Defendants' creditors" for limitations purposes. *Janvey v. Democratic Senatorial Campaign Cmte.*, 793 F. Supp. 2d 825, 834-35 (N.D. Tex. 2011). Romero, who once owned a Stanford CD himself, was an outside consultant to SFG on a contract basis. Romero did not know, nor should he have known about the Stanford Ponzi scheme. In fact, Romero's own due diligence investigation regarding SFG via a high ranking State Department official did not reveal any adverse information.

Contrary to Plaintiffs' conclusory allegation in the Complaint, Romero was not an insider of SFG. Romero served as an external consultant to SFG retained to provide insight and advice based on his knowledge and experience in Latin America and the Caribbean. Romero did not advertise, market, or sell CDs or any other product for SFG at any time. He had absolutely no involvement in the business operations of SFG. *See, e.g.,* Romero Decl. ¶ 30.

Romero was a highly-decorated former public servant with an impeccable record. He had ahead of him a lucrative future in the consulting business. Any suggestion that Romero would risk tarnishing his image and jeopardizing his future by knowingly associating with a Ponzi scheme is irrational. But perhaps nothing demonstrates his lack of knowledge regarding SFG's wrongdoing as much as him using his connections to arrange for his son to get a job at SFG. He certainly would not have done so if he had any inkling that SFG was a Ponzi scheme.

The Receiver himself acknowledges that he was "only able to discover the fraudulent nature" of the scheme "after R. Allen Stanford and his accomplices were removed from control of the Stanford entities and after a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the Stanford entities." Complaint at ¶ 7.[8] If such herculean efforts by the Receiver were necessary to discover the fraud after the implosion of the scheme, Romero cannot reasonably be expected to have discovered the fraud while SFG was still, based on all appearances, a thriving and well-respected company.

Equally telling is the fact that long-time, high-ranking officials within SFG were not aware of the fraudulent scheme until February 2009. For example, Juan Rodriguez-Tolentino, who served as President and Chief Operating Officer for Stanford International Bank, Ltd. (the entity which actually sold the Stanford CDs), broke down in tears during his deposition as he discussed the shock of learning of the scheme in February 2009. *See* Rodriguez-Tolentino Depo 31:16-19; 137:7-140:18. Until that day, Mr. Rodriguez-Tolentino never suspected anything was amiss at SFG because it was routinely audited, was visited by financial services regulatory commission members, had affiliate entities that were licensed by the SEC and opened offices in regulated jurisdictions around the globe. *See* Rodriguez-Tolentino Depo 141:20-142:19 (APP

---

[8] Plaintiffs go into even more detail regarding the extensive efforts needed to uncover the alleged scheme in their Response to Defendant Luis Giusti's Motion for Summary Judgment and Brief in Support (Dkt. 99), Case 3:11-cv-00292-N-BG, at pp. 6-9.

181-182).   He further stated that the advertised return rates on the Stanford CD appeared reasonable based on the disclosures and financials that were generated by the company.  *See* Rodriguez-Tolentino Depo 145:15-152:19 (APP 182-184).

Similarly, Ms. Suarez never had concerns regarding the legitimacy of the Stanford CD. *See* Suarez Depo 127:6-12 (APP 145).  She also had no knowledge or inclination that SFG was running a Ponzi scheme or fraud and does not believe any IAB members had any such knowledge or inclination.  *See* Suarez Depo 159:2-13 (APP 163).  If such high ranking officials within SFG were not aware of the scheme, then how was Romero, as an outside consultant, supposed to have known?

Finally, the summary judgment evidence shows that Romero had no involvement in the marketing or selling of Stanford CDs – or any SFG product for that matter – and no knowledge of or involvement with the allocation of CD proceeds.  Suarez, who coordinated the activities of the IAB and dealt with Romero more than any other person at SFG, confirmed that Romero (1) never marketed, sold, promoted or even mentioned the Stanford CD or any other product, (2) was not required to have any knowledge of SFG's products, and (3) was not involved in any way in the investment of CD funds.  *See* Suarez Depo 120:11-24 (APP 141); 138:20-139:3 (APP 148-149); 151:18-152:11 (APP 158-159).

Romero has met his burden to show he took the payments in good faith.  Plaintiffs have no credible evidence to the contrary.

>        **2.        The evidence conclusively demonstrates that Romero gave reasonably equivalent value in exchange for the disputed payments.**

This Court has analyzed the reasonably equivalent value prong of the good faith defense as a two-step process.  *See* Order dated November 5, 2013 (Dkt. 93) in *Janvey et al. v. TGC, LLC*, Civil Action No. 3:11-CV-0294-N ("TGC Order"). The first question is whether value was

given, and then whether that value was reasonably equivalent. *Id.* The summary judgment evidence proves as a matter of law that Romero provided reasonably equivalent value to SFG.

Plaintiffs cannot dispute that Romero's contract and dealings with Stanford were "arms' length, in good faith, at fair market value, and in the ordinary course of business." TGC Order at 13, n. 6 (noting factors relevant to the question of reasonably equivalent value). Plaintiffs instead assert the same untenable position that the Receiver took with Golf Channel: (1) Romero's services had no value from the perspective of Stanford's creditors and (2) services that advance a Ponzi scheme have no value as a matter of law. *See* First Am. Compl. at ¶ 41. As in *TGC*, neither of these legal propositions applies here.

### a.   *Romero's Services Constituted Value to SFG.*

TUFTA § 24.004(a) defines "value" as follows:

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

In *TGC*, the Court rejected the Receiver's contention that value must be determined solely from the perspective of the creditors years later. TGC Order at 12-13. The fact that a transaction "did not result in a tangible asset on which Stanford's creditors could levy and execute is not dispositive" of the question of value. TGC Order at 12. Value is properly determined at the time of the transfer and not years later. *Id.* at 10-12. For instance, consumables—whether water from the water company, power from the power company, dinner from a restaurant,[9] or ad space from a television channel[10]—constitute value to the debtor despite the fact that nothing is left for creditors to liquidate. *Id.* at 12. Even intangible benefits to the

---

[9] *See Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771, 772 (6th Cir.1995).
[10] *See generally* TGC Order.

debtor (*e.g.*, advice from psychic hotlines[11]) or speculative investments (like bets at a blackjack table[12]) provide "value" under UFTA sufficient to meet the first step of the reasonably equivalent value inquiry. *Id.* at 11-12. Any suggestion that the value received by a debtor should be considered solely from the viewpoint of creditors, years after the fact, "is of course nonsense." *Id.* at 12. Instead, the value of the services provided to SFG by a party such as Romero must be considered at the time of the transaction and should not focus on resultant tangible assets. *See id.*

In *TGC*, the Court cited an example from *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996), which is instructive in framing the threshold question of "value." The *Mellon* court considered a window-washer who had been paid market rate for cleaning windows. That the transaction was at arms' length and at market rate (while relevant to the "reasonably equivalent" step) was not relevant to whether the debtor received "value;" "'value' was conferred because D obtained a palpable benefit from the service performed – i.e., clean windows." *Id.* The *Mellon* court went on to apply the window-washer illustration to ascribe "value" to a company's extension of a guaranty and security interest to its buyout target for no direct consideration. *Id.* The court found that value was provided to the company in the form of indirect benefits based on the (intangible) "expected synergy" of a merger between the company and its target. *Id.* at 149-50.

Romero performed valuable services for SFG over the course of approximately seven years. Among other work, he provided advice regarding political and economic issues in Latin America to persons within SFG. Romero made presentations to SFG employees and clients of SFG regarding, for example, the investment climate of Latin America, the Central American Free Trade Agreement, and other foreign policy and political issues impacting investment in

---

[11] *Samson v. U.S. West Commc'ns, Inc. (In re Grigonis)*, 208 B.R. 950, 956 (Bankr. D. Mont. 1997).
[12] *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771, 772 (6th Cir.1995).

South America, all of which required extensive preparation, travel, and meeting time. Romero met with state and local officials in Ecuador to discuss SFG development and construction in the area, including investment in the infrastructure. He also presented lectures to South American officials on U.S. politics, such as the 2004 presidential elections, in order to help build business and political relationships in the region.  *See, e.g.,* Romero Decl. ¶ 31.

Romero's consultation regarding Latin American matters provided value to Stanford in establishing connections abroad and assisting with investment opportunities in the region. Romero educated Stanford regarding political and economic issues and raised its profile in Latin America, establishing the foundation for a partnership in the region. Romero estimates he worked for over 1,700 hours on behalf of SFG between 2002 and 2008.  Romero Decl. ¶ 32. Like "clean windows" or "expected synergy," Romero provided SFG commercially valuable advice and connections—in other words, a "palpable benefit"—that was not tangible or durable.

Further, although the results of his efforts should not dictate whether Romero provided value to SFG ("benefit is appropriately valued as of the time the investment was made"), the investments in Latin American businesses that Romero helped arrange were ultimately successful and substantially profited SFG, with one investment returning more than $4 million in profit. That Romero's work led to a tangible benefit reflects that it was commercially valuable to SFG. At the least, Romero's economic and political advice provided more objective value to SFG's business than the psychic hotline advice provided to the aging widow in *Samson v. U.S. West Commc'ns, Inc. (In re Grigonis)*, 208 B.R. 950, 956 (Bankr. D. Mont. 1997), which this Court cited approvingly.  *See* TGC Order at 11-12.

### b.   *Romero's Services Were for Reasonably Equivalent Value.*

TUFTA provides that "'[r]easonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold

the assets in an arm's length transaction." Tex. Bus. & Com. Code § 24.004(d). The Court must therefore balance the "value" of what was received by Romero with that which he provided to SFG. *In Re WCC Holding Corp.*, 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994). "There does not need to be exact mathematical equivalence." *Id.* (citing *Southmark Corp. v. Riddle (In re Southmark Corp.)*, 138 B.R. 820, 829 (N.D. Tex. 1992)). Value is calculated at the time of transfer. *See supra* at 18; *see also WCC Holding*, 171 B.R. at 984 ("The inquiry should focus on whether WCC paid a fair price, not on what its net recovery would be on liquidation.").

Romero contracted with SFG in an arms' length transaction to provide consulting services related to Latin America and the Caribbean on an as-needed basis for $100,000 per year plus expenses. This was a typical arrangement for Romero's services, which required him to expend significant amounts of time each year providing his expertise to SFG.  The contracted amount was fair market value for services of Romero, who commanded comparable if not higher rates from other companies for similar services with similar time commitments.  *See supra* at 7.

According to Suarez, the compensation paid to Romero was reasonable and SFG received value for his salary. *See* Suarez Depo 156:23-25 (APP 162). The amount of time dedicated by Romero on behalf of SFG more than met Ms. Suarez's expectations and she never heard any complaints regarding the quantity or quality of Romero's work. *See* Suarez Depo 153:10-154:5 (APP 160-161).  Notably, Romero's compensation remained the same despite the fact that SFG requested an increasing amount of time as its operations in Latin America expanded. *See* Suarez Depo 137:2-15 (APP 147).

Romero therefore provided SFG reasonably equivalent value in exchange for payments for his services.

The Receiver also seeks to avoid SFG's reimbursements of Romero's travel expenses. Romero incurred all expenses for which he seeks reimbursement in performance of his contract

with SFG. Romero Decl. ¶ 34; *see, e.g.,* APP 096-107.   Romero came out of pocket to pay for plane tickets, taxis, and food while traveling on business for SFG, with the expectation that he would be reimbursed based on his contract with SFG. *See* APP 012.   There is no dispute that Romero actually incurred these expenses at the market price of the goods and services. SFG received reasonably equivalent value for the reimbursements, which paid for necessary travel so that Romero could perform his contract.

### c.     *Romero's Services Did Not Advance the Ponzi Scheme.*

In their Complaint, Plaintiffs assert a public policy exception to "value" according to which goods or services that further a Ponzi scheme constitute no value as a matter of law. *See* First Am. Compl. at ¶ 41 (citing *Warfield v. Byron*, 436 F.3d 551, 555, 560 (5th Cir. 2006)). The case on which Plaintiffs rely in their Complaint and the other cases Plaintiffs have historically cited in support of this proposition involve situations where the defendants brokered the sales of the instruments central to the Ponzi scheme and the payments at issue were commissions on those sales.[13]   See *Id.*; *Ramirez Rodriguez v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997); *Randy v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438-39 (Bankr. N.D. Ill. 1995).

Here, Romero was not involved in sales of CDs, nor was his pay directly or indirectly tied to CD sales. Romero's contract services were entirely unrelated to SFG's alleged Ponzi scheme of selling CDs to investors. Rather, Romero provided his years of education and expertise to assist SFG in making legitimate investments in Latin American countries, made numerous speeches on purely geo-political topics and assisted on matters including a theft investigation in Venezuela. Romero never provided services that directly or indirectly advanced

---

[13] In Footnote 7 of the Net Winners Order, this Court noted that *Warfield* dealt specifically with services provided by CD brokers and that even a holding that actual employees of the Ponzi scheme provided reasonably equivalent value was not necessarily in conflict with *Warfield* because such services may not directly extend the fraud like the services of the broker.  Romero's services were even more removed from the work of an SFG employee.

the scheme.

In the TGC Order, the Court rejected the Receiver's argument that Golf Channel advanced the Ponzi scheme by providing SFG advertising time during its broadcast. "Golf Channel did not actively promote Stanford's Ponzi scheme or sell CDs. It simply provided a pipe to customer's televisions. It was up to Stanford to determine what content flowed through the pipe." TGC Order at 15. Though the Court's opinion suggests Golf Channel's goods and services might have "incidentally" advanced the Ponzi scheme, the Court nonetheless held as a matter of law that Golf Channel's goods and services did not advance the Ponzi scheme in a manner sufficient to trigger the public policy exception.[14]

Romero's services were even less related to the alleged Ponzi scheme than Golf Channel's. Like Golf Channel, Romero "did not actively promote Stanford's Ponzi scheme or sell CDs." Romero had a legal contract for consulting services related to economic and political interests in Latin America and the Caribbean. The compensation for his services was unrelated to and not contingent upon the sales of CDs. These facts alone remove Romero's situation from the so-called public policy exception. *See Warfield*, 436 F.3d at 560; *Ramirez Rodriguez*, 209 B.R. at 434; *In re Randy*, 189 B.R. at 438-39.  But Romero's situation is even more compelling than Golf Channel's. Unlike Golf Channel, Romero did not provide SFG a medium for SFG to directly promote any fraudulent CDs. As the summary judgment record reflects, Romero provided services that were wholly distinct from the CDs and could not even be seen as "incidentally" advancing a fraudulent scheme.[15]

---

[14] In another similarity to *TGC*, Plaintiffs are unable to identify a single individual who purchased a Stanford CD because of anything that Romero did or said.  *See* Plaintiffs' Discovery Responses (APP 218).

[15] In TGC, the Court found irrelevant to its analysis the question of whether Golf Channel's advertising resulted in the sale of more fraudulent CDs than Stanford would have otherwise sold. TGC Order at 4 n. 1.  There, the Receiver relied on an expert analysis in an attempt to create a fact question on the issue.  Here, in contrast, the Receiver has not retained an expert tying Romero's services to any increase in CD sales and, to the extent relevant, there is no evidence in the record suggesting Romero's services advanced Stanford's Ponzi scheme.

> ### d.   *Romero Should Be Allowed to Assert the Good Faith Defense Based on Public Policy*

Romero has proven as a matter of law that he acted in good faith and provided SFG with reasonably equivalent value for his compensation in the form of services that benefited SFG. Romero spent significant time providing services to SFG—an estimated 1700+ hours—for which he was fairly compensated.  Romero Decl. ¶ 32.  Had SFG not engaged Romero, he could have devoted such time to other clients.   In performing these services, Romero incurred travel expenses for which he was properly reimbursed. None of Romero's work related to the sale of CDs. Allowing the Receiver to disgorge Romero's hard-earned money under these circumstances would simply be unjust. As in *TGC*, concluding that Romero provided value on these facts would be "consistent with public policy," particularly where Romero, like the many innocent employees or contractors of Stanford who earned their money through hard work, provided significant amounts of time and effort with the intent to help the organization succeed.

## C.   Romero Is Entitled to Summary Judgment that Plaintiffs Cannot Recover His Principal Investment in an SIB CD.

Among the transfers to Romero that Plaintiffs seek to avoid as a fraudulent transfer is a payment of $234,862.15. That payment is a return of Romero's principal investment in a SIB CD ($230,000) plus accrued interest ($4,862.15).  *See supra* at 11-12.  Romero is entitled to retain his principal investment based on the legal conclusions reached by this Court in its January 22, 2013 Order [Dkt. 909] in *Janvey v. Alguire*, Case 3:09-cv-00724-N-BL (the "Net Winners Order"). Romero has established herein that he took payments in good faith. The Net Winners Order establishes that his principal investments were for reasonably equivalent value.

Relevant to this Motion, the Court adhered to "the general rule that investors may keep principal payments but must return interest payments …." Net Winners Order at 24. The Court found that the return of the CD investors' principal investments "paid down an antecedent debt

and, as such, were given for value." *Id.* Romero has already established that he acted in good faith. In his status as an investor, nothing distinguishes him from the investors in the Net Winners Order who gave reasonably equivalent value (in fact, dollar-for-dollar value) for the return of their principal investment. Romero is therefore entitled as a matter of law to retain the return of his $230,000 principal investment.[16]

**D.     Romero is Entitled to Summary Judgment on Plaintiffs' Unjust Enrichment Claim.**

The Plaintiffs' claim for unjust enrichment fails for several reasons. First, several courts have held that "[u]njust enrichment is not a distinct independent cause of action" under Texas law.[17]   Second, Plaintiffs' claim for unjust enrichment is barred by the existence of a written contract.[18]   In this case, Romero accepted a written offer letter from SFG and performed for the next seven plus years under the terms of that letter agreement.   *See* APP 013.   Third, even if Plaintiffs' unjust enrichment claim is viewed as a claim for money had and received or some similar equitable theory, Plaintiffs cannot prove the elements of such an equitable theory as a matter of law.   Specifically, there is no evidence to show Romero obtained payments by coercing, defrauding or taking undue advantage of SFG, or that it would be unconscionable for Romero to keep the monies paid to him pursuant to the terms of his written contract or otherwise.[19]   For all the reasons set forth in this section and elsewhere above, there is nothing unjust about allowing Romero to retain the payments he received under his contract.   Romero is entitled to summary judgment and Plaintiffs' unjust enrichment claim should be dismissed.

---

[16] In the Net Winners Order, the Court granted summary judgment that the Receiver may avoid and disgorge the interest received by "winning" investors in the Stanford Ponzi Scheme. The Court certified the issue for interlocutory appeal, which is pending. Plaintiffs in this case have not moved for summary judgment on the same issue, and Romero reserves the right to challenge any claim to disgorge the $4,862.15 in interest he received.

[17] *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. struck); *Richardson Hospital Authority v. Duru*, 2012 WL 5506984, *3 (Tex. App.—Dallas 2012).; *Connect Insured Telephone, Inc. v. Qwest Long Distance, Inc.*, 2012 WL 2995063, *9 (N.D. Tex. 2012).

[18] *See Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

[19] *See Heldenfels Bros, Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Respectfully submitted,

**KANE RUSSELL COLEMAN & LOGAN PC**

By:     /s/ *Brian W. Clark*
          Lawrence T. Bowman
          State Bar No. 00788993
          Brian W. Clark
          State Bar No. 24032075

1601 Elm Street, Suite 3700
Dallas, Texas 75201
Tel:     (214) 777-4294
Fax:     (214) 777-4299

**ATTORNEYS FOR DEFENDANT PETER
ROMERO**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via the Court's ECF system on this 17th day of June, 2014 upon all counsel of record.

          /s/ *Brian W. Clark*
          Brian W. Clark